# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JUSTIN CORNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1130-SEM |
| | ) | |
| COLLECTABLE SPORTS ASSETS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

Report: May 29, 2025
Date Submitted: April 8, 2025

## POST-TRIAL REPORT

Arthur G. Connolly, III, Jarrett W. Horowitz, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; *Counsel for Plaintiff Justin Cornett*.

Kasey H. DeSantis, Joshua K. Tufts, FOX ROTHSCHILD LLP, Wilmington Delaware; *Counsel for Defendant Collectable Sports Assets, LLC*.

**MOLINA, Senior Magistrate**

Through this action, a member of a limited liability company seeks to inspect the company's books and records for valuation and investigation purposes. The company concedes that the member has a proper valuation purpose. But the company contests the propriety of the investigation purpose and altogether denies that any court-ordered inspection is warranted. Part of the company's justification is that it has already offered, and is still willing, to produce books and records responsive to six of the requested categories of records and information. Although I appreciate this "give," I find the member is entitled to more. Through this ruling, I side almost entirely with the member and herein order production of most of the books and records requested. Because the limited liability company agreement provides as much, this court-ordered production should be subject to a confidentiality agreement, for which I have provided some guidance. I have also concluded that the parties should each bear their own fees, though costs should be shifted in the member's favor as the prevailing party.

This is my post-trial report.

## I. BACKGROUND

By way of this action, Justin Cornett (the "Plaintiff") seeks books and records of Collectable Sports Assets, LLC (the "Defendant"). Before turning to the merits of his request, I begin with a brief factual background. The following facts are drawn

from the parties' stipulations in the pretrial order, 228 exhibits, and argument presented at our half-day paper record trial on April 8, 2025.[1]

## A. The Defendant's Business Model

The Defendant specializes in the acquisition, maintenance, and sale of fractionalized shares in investment-grade collector sports memorabilia.[2] It was founded as a series limited liability company ("LLC") in 2020 by Ezra Levine and Jason Epstein, intending to "have a steady cadence of some really tremendous investment opportunities for sports fans of all income brackets all across the country"[3] and "give people opportunities to make money[.]"[4]

To fulfill its purpose, the Defendant would acquire sports memorabilia in one of two ways—by either: (1) purchasing an item directly, or (2) entering into a consignment agreement permitting the Defendant to list the item on its platform in exchange for retained equity paid to the owner upon the item's sale.[5]

---

[1] *See* Docket Item ("D.I.") 50 ("Pretrial Order"), 55 ("Tr."). The parties' jointly submitted exhibits are cited as "JX__." As submitted, the joint exhibits are stamped in the bottom right corner of each page with "JX-[exhibit number]-[pincite]." For purposes of this post-trial ruling, I cite to the joint exhibits in a more conventional form such that, for example, "JX-100-001" becomes "JX100 at 1."

[2] Pretrial Order at p. 2 ¶ 5.

[3] JX12 at 2.

[4] JX27 at 10.

[5] *See* JX91 at 10 (explaining the three formal mechanisms through which the Defendant would acquire assets—consignment, upfront purchase, and by agreement).

2

Each acquired item corresponds to a unique series, and investors were sold fractional shares in the underlying item. Investors could acquire series interests in one of two ways: (1) participate in an IPO, or (2) acquire shares on the secondary trading market.[6] When the Defendant received an offer to outright purchase an asset, the current investors in the corresponding series would vote to either accept or reject the sale, with each voting proportional to their numbers of shares in that item.[7] Should an offer be approved by a majority of unit-holders, an advisory committee would offer guidance and, if finalized and a sale made, proportionally distribute proceeds.[8] If an offer was denied, trading on the secondary market would continue.[9]

---

[6] *See, e.g.*, JX18 (email from Mr. Levine to "Early Access Members" seeking their desired weekly IPO allocation); JX20 (same); Pretrial Order at p. 2 ¶ 7 (stipulating that the Defendant "advertised the possibility that members could seek value from their investments through sale of shares on the secondary trading market"). Despite such advertisement, the Defendant avers that at no point did it *guarantee* that an active secondary market would develop. D.I. 46 ("Def.'s Ans. Br.") at 5 (citing its answer at JX162 ¶ 9). As a quick point of aside, although D.I. 46 is technically the Defendant's corrected answering brief, I omit the word "corrected" from the defined term for brevity's sake.

The Defendant had also considered "blind pool offerings" through which investors would not know the underlying asset they were investing in. Pretrial Order at p. 5 ¶ 21. Shortly after the Defendant filed its offering circular, however, the SEC commented on the proposal, noting that the offering would not be qualified unless the underlying assets were identified. *Id.* ¶ 22. In response, the Defendant removed all blind pool offerings. *Id.* ¶ 23.

[7] *See, e.g.*, JX87 (message to the Plaintiff seeking "feedback to assess interest in a liquidity opportunity of this asset, via auction or buyout offer"); JX89 (same); JX90 (same).

[8] *See* JX91 at 10 (explaining the asset liquidity process); JX79 (reflecting the results of a buyout offer, and noting that "[o]n a share weighted basis, 67% chose to REJECT the buyout offer[,] [and] as a result, the Manager has declined the buyout offer").

[9] *See* JX79 (reflecting the rejection of a buyout offer, and noting that "[t]he asset [would] continue to trade on [the Defendant's] secondary market").

These items were often of high value, so it is wholly fitting that where they were stored bore import. Indeed, assets would be stored "along with other assets, in a professional facility and in accordance with standards commonly expected when managing [assets] of equivalent value and always as recommended by the [a]dvisory [b]oard."[10]

The Defendant's operations are governed by the seventeenth amendment to the operating agreement, dated October 21, 2024 (the "LLC Agreement").[11] To some extent, the LLC Agreement incorporates or mirrors Delaware's Limited Liability Company Act (which it refers to as the "Delaware Act");[12] but in some ways it varies. A few provisions are worth noting, particularly those regarding: (1) members, (2) the managing member, and (3) books and records.

---

[10] JX50 at 8. Although a news article reported that "[f]or most services like [the Defendant], collectibles are insured and stored away in top-secret vaults under temperature-controlled environments[,]" JX80 at 5, the Plaintiff did not direct me to (and I could not find) any such *requirement* for the Defendant to do so. The Plaintiff raised the point that in May 2021 he consigned a photo to the Defendant, endeavoring to do so "because the Defendant agreed to store the asset in a [specified vault, which was a] mutually agreeable location[.]" D.I. 40 ("Pl.'s Op. Br.") at 11. But as the Defendant noted, such is not indicative of an agreement to store *other* assets. Instead, that agreement applied only to the specific item subject to the consignment agreement. Def.'s Ans. Br. at 45 n.16; *see* JX28 (consignment agreement between the Plaintiff and the Defendant stating that the parties would "mutually agree on a secure storage location that meets any and all insurance, protection, and maintenance requirements to protect asset shareholders for the duration the asset is listed on [the Defendant's] platform").

[11] Pretrial Order at p. 2 ¶ 6.

[12] For clarity, I will do the same.

4

**Members.** Under the LLC Agreement, members associated with a series are members of the Defendant, and all series members comprise the Defendant's members.[13] But, a "series designation," written by the Defendant's managing member, may "designate, fix and determine the relative rights, powers, authority, privileges, preferences, duties, responsibilities, liabilities and obligations in respect of Interests of such Series and the Members associated therewith (to the extent such terms differ from those set forth in [the LLC Agreement])."[14]

**Managing Manager.** Before discussing the Defendant's manager, it is important to note that the Defendant's operations are conducted in close coordination with two related entities: CS Assets Manager, LLC ("CSAM") and Collectable Technologies, Inc. ("CTI"). CSAM is owned by CTI and is the Defendant's managing member.[15] Per the LLC Agreement, as managing member, CSAM holds the authority "to do any and all acts and things necessary or appropriate for the furtherance and accomplishment of the purposes [of the Defendant]."[16]

---

[13] JX10 ("LLC Agreement") at 11.

[14] *Id.* § 3.3(c).

[15] *Id.* § 3.1(h); JX50 at 5. I note that, although the Defendant argues that the Plaintiff lacks standing to investigate CSAM and CTI, Def.'s Ans. Br. at 48, such is a moot point given the Plaintiff's representation that he "does not seek records from any entity other than [the Defendant]." Pl.'s Op. Br. at 4.

[16] LLC Agreement § 3.1.

**Books and Records.** Article VIII of the LLC Agreement governs books, records, accounting, and reports. At issue in this action is Section 8.1(b), which provides:

> Each Member shall have the right upon, reasonable demand for any purpose reasonably related to the Member's Interest as a member of the Company (as reasonably determined by the Managing Member) to such information pertaining to the Company as a whole and to each Series in which such Member has an Interest, as provided in Section 18-305 of the Delaware Act; provided, that prior to such Member having the ability to access such information, the Managing Member shall be permitted to require such Member to enter into a confidentiality agreement in form and substance reasonably acceptable to the Managing Member. For the avoidance of doubt, except as may be required pursuant to Article X, a Member shall only have access to the information (including any Series Designation) referenced with respect to any Series in which such Member has an Interest and not to any Series in which such Member does not have an Interest.

Article X governs removal of the Defendant's managing member because of fraud or other misconduct.[17]

> Further, Article VIII has a confidentiality provision which provides:

> All information contained in the accounts and reports prepared in accordance with [Article] VIII and any other information disclosed to an Economic Member under or in connection with this Agreement is confidential and non-public and each Economic Member undertakes to treat that information as confidential information and to hold that information in confidence. No Economic Member shall, and each Economic Member shall ensure that every Person connected with or associated with that Economic Member shall not, disclose to any Person or use to the detriment of the Company, any Series, any Economic Member or any Series Assets any confidential information which may have come to its knowledge concerning the affairs of the Company, any

---

[17] JX10 at 39.

Series, any Economic Member, any Series Assets or any potential Series Assets, and each Economic Member shall use any such confidential information exclusively for the purposes of monitoring and evaluating its investment in the Company.

## B.     The Plaintiff's Interests

The Plaintiff has been an avid investment sports memorabilia collector since at least 2013,[18] and is a sophisticated investor. His collection and investment strategy includes locating rare, one-of-a-kind items with a preserved, likely-to-increase value, keeping with him the control of any possible sale.[19] But, to some extent, he agreed to release full control when investing with the Defendant.

The Plaintiff's membership in the Defendant is not contested.[20] At one point he held investments in twenty-three different series, and for a time his portfolio averaged over one million dollars.[21] Presently, the Plaintiff holds interests in eleven series, which include a Luka Doncic game-worn rookie jersey (the "Luka Jersey"), Wilt Chamberlain high school uniform, and various baseball cards.[22]

---

[18] JX6 at 5.

[19] *Id.* at 8.

[20] Pretrial Order at p. 2 ¶ 3. The plain language of the pretrial order offers that the parties agree that the Plaintiff "is a 'member' of the Defendant[.]" *Id.*

[21] *See, e.g.*, JX42 (reflecting the Plaintiff's various series interests for the period of September 1, 2021 through September 30, 2021); JX51 (indicating a May 7, 2022 portfolio value of $1,115,434.66); JX54 (indicating a May 28, 2022 portfolio value of $1,147,594.63); JX60 (indicating a July 2, 2022 portfolio value of $1,139,880.84).

[22] *See* Pretrial Order at pp. 3–5 ¶¶ 8–19 (listing the Plaintiff's eleven present interests); Def.'s Ans. Br. at 5–6 (same).

## C. The Defendant's Struggles

Despite finding initial success, the Defendant has since faced a steady decline. In its fiscal year 2021 annual report, the Defendant disclosed that a greater-than-expected supply of items were set to be consigned on its platform.[23] Although objectively a good problem to have, without a robust sales market the Defendant would potentially need to hold and maintain those assets for long periods of time, directly (and unexpectedly) increasing various operations and overhead costs.[24]

Observing what it coined a "current weakness in the market" at year-end 2022,[25] the Defendant was actively working to keep its head above water. On March 27, 2023, the Defendant's board held a meeting to discuss both liquidity concerns and the business's overall status.[26] Following that meeting, members were notified of founder Ezra Levine's resignation, through which Mr. Jarod Winters, the Defendant's chief operations officer ("COO"), was promoted to president and COO, giving him certain priorities including: (1) removing unnecessary expenses, (2) providing liquidity for users on the platform, and (3) recouping cash from asset sales

---

[23] *Id.* ¶ 20.

[24] JX50 at 13.

[25] JX91 at 28.

[26] *See* JX86 (relaying an update to the Defendant's members following a March 27, 2023 board meeting).

off the platform for the Defendant's members.[27] Members were also informed of shakiness in the Defendant's business model and the break-down of discussions of a potentially large investment in (or acquisition of) the Defendant because of "market conditions."[28]

In a May 2023 SEC Form 1-K filed for the 2022 fiscal year, the Defendant noted its "significant doubt that it [would] be able to operate for another 12 months unless it receive[d] additional liquidity[,]"[29] and shortly thereafter informed members that most of its assets were being sent to third-party auctions and that it would continue to seek external investment opportunities.[30]

### D. The Change in Ownership and Growing Suspicions

On June 16, 2023, the Defendant entered into an acquisition agreement with Fractional Ownership Holdings, LLC ("FOH"), a Wyoming-based LLC owned by

---

[27] *Id.* at 1. At some point, Mr. Winters received title to a plethora of other positions. *See, e.g.,* JX91 at 29 (listing Mr. Winters's position as "COO/CCO"); JX121 at 3 (noting that Mr. Winters was "President, Authorized Representative, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Chief Compliance Officer").

[28] JX86 at 1. The Defendant also disclosed it had "ceased executing [IPOs] as the fractional IPO market has completely dried up" and substantially downsized its number of staff. *Id.*

[29] JX91 at 28.

[30] JX95–96.

Mr. Philip Neuman, for $1.6 million.[31] A few months later, on August 21, 2023, FOH also acquired CTI.[32]

Under CTI's acquisition agreement, the parties were to ensure a "smooth transition of operating CTI's business to provide continuous service to CTI's fractional owners and individuals with CTI trading accounts[,]" with "[s]uch cooperation [to] include advance assignment or transfer of vendor and supplier contracts[.]"[33] At the same time, CTI's board members stepped down from their roles as CTI directors and as officers and agents of CTI, CSAM, and the Defendant.[34] As a result, Mr. Neuman was appointed as CTI's sole director, which continued serving as CSAM's sole member.[35] Mr. Winters continued to be CSAM's only officer and the Defendant's president, CCO, and COO.[36] In September of 2023, the Plaintiff emailed Mr. Winters multiple times to discuss concerns that had been brewing, and in November that same year asked for "an update on things" because he had not "heard anything as to the status of the company."[37]

---

[31] Pretrial Order at p. 6 ¶ 26.

[32] JX105.

[33] JX99 at 5.

[34] JX105.

[35] *Id.* Mr. Neuman presently serves as CSAM's COO and CCO. Tr. 53:5–9.

[36] JX105.

[37] JX107; JX109; JX113.

As time went on, wires further crossed. On at least one occasion, Mr. Winters forwarded the Defendant's business emails to FOH's CEO, Jeffry Gangl.[38] Further, certain series assets of the Defendant have been displayed at the Dretore Investment Gallery (the "Dretore Gallery"), which showcases assets of NoCor Investment Fund, a fund also owned by Mr. Neuman.[39] Upon discovery, the Plaintiff asked why members were uninformed of the change, and raised concerns about the overall lackluster communication with members.[40] Mr. Winters admitted that he, too, was "frustrat[ed] with [the] situation" and could not provide a "good answer."[41]

Following invitation to visit the Dretore Gallery, which the Plaintiff accepted, the Plaintiff expressed his belief that the circumstances were "utter madness[.]"[42] The Plaintiff met with Messrs. Winters and Neuman shortly thereafter on March 13, 2024,[43] though that discussion did nothing to assuage the Plaintiff's concerns, and, in fact, may have even heightened them.

About a month later, on or around April 12, 2024, Mr. Winters was terminated from his employment both with the Defendant and from his various CTI roles.[44] A

---

[38] JX108.

[39] Pretrial Order at p. 6 ¶ 27.

[40] JX114; JX116.

[41] JX117.

[42] JX115.

[43] *See* JX118 (meeting invitation).

[44] Pretrial Order at p. 6 ¶ 28; JX121.

few days later on April 15, 2024, Ms. Adeliza Pérez-Johnson assumed Mr. Winters's responsibilities, and the Defendant moved corporate offices and changed its registrant phone number.[45] Ms. Pérez-Johnson's assumption of Mr. Winters's responsibilities was to last only "until her successor [was] elected and qualified."[46] Despite these representations, members were informed that, as of August 9, 2024, Ms. Pérez-Johnson would "continue on with the title Manager of [CSAM] and the [Defendant]."[47]

On April 19, 2024, Ms. Pérez-Johnson advised the Plaintiff that interested parties should submit a formal proposal for buyout offers "regarding the [Defendant's] collection of assets."[48] Doing so would permit a "review, feasibility assessment, and presentation to [the] advisory board. . . . to ensure fair evaluation and compliance."[49] In response, the Plaintiff suggested that the Defendant either consign the Luka Jersey to Sotheby's immediately, or that, alternatively, the Plaintiff would offer $250,000 for it and "take the risk [himself]."[50] Without hearing anything further, on May 27, 2024, the Plaintiff and a fellow member, Mr. Jason Silverstein,

---

[45] JX121.

[46] *Id.* at 3.

[47] JX131 at 3.

[48] JX122.

[49] *Id.*

[50] JX123.

contacted the Defendant's head of consignment.[51] As the "half" owner of the Luka Jersey, Mr. Silverstein offered his support for the Plaintiff's Sotheby's presentation proposal.[52] The consignment head offered to take both offers to management, though the Plaintiff identified the better option would be to send the jersey to auction.[53]

Just a few days later, the Plaintiff learned that the Defendant would no longer be engaging members to vote on buyout offers, and a new committee, spearheaded by Mr. Neuman, would independently decide whether to sell or send an asset to auction.[54] The Plaintiff never heard back regarding his buyout offer.

Beyond questions surrounding the assets themselves, suspicions also grew regarding governmental filings and the Defendant's actions generally. As of trial, the Defendant had not filed its annual SEC Form 1-K due on April 29, 2024, and on May 1, 2024, it halted trading on the secondary market.[55] Then in August of 2024 the media picked up the story, only adding further fuel to the fire.[56]

---

[51] JX124.

[52] *Id.* at 2.

[53] *Id.* at 3.

[54] JX125.

[55] Pretrial Order at p. 6 ¶¶ 30–31.

[56] JX129–30.

### E. The New Owner's Past

Much of the Plaintiff's concern about the new owner, Mr. Neuman, relates to Mr. Neuman's past. Mr. Neuman (personally and through related entities) has been involved in various lawsuits over the years, including: (a) a 2006 Nevada case that resulted in summary judgment against Mr. Neuman,[57] (b) a 2007 California case through which Mr. Neuman was dismissed and a later settlement reached,[58] (c) a 2008 New Jersey case that resulted in settlement,[59] (d) a 2011 New York action to recover unpaid legal fees,[60] (e) a 2019 Louisiana commercial rent action, which is yet to be adjudicated,[61] (f) a 2020 New York action through which Mr. Neuman alleged fraud perpetrated against him, which resulted in settlement,[62] (g) a 2021 New York action wherein Mr. Neuman initiated a defamation suit,[63] (h) a recent California action affirmed in part, but still partially before, the Ninth Circuit, which deemed Mr. Neuman the alter ego of a company and found him personally liable for

---

[57] JX1; JX228.

[58] *See* JX2 at 9 n.1 (referring to Mr. Neuman's alleged involvement and ultimate dismissal and settlement); JX216 at 4–5 (Mr. Neuman's sworn declaration in connection with this action, explaining that he received a $525,000 settlement).

[59] JX2 (trial memorandum).

[60] *See* JX3.

[61] *See* JX8.

[62] *See* JX216 at 10–11.

[63] JX23; JX226.

a three-million-dollars-plus judgment,[64] and (i) ongoing Florida litigation.[65] This history, in the Plaintiff's mind, contributed to the red flags under the Defendant's new management.

## F. The Demand[66]

Concerned about his investment, on or about October 21, 2024, the Plaintiff served the operative demand for inspection of books and records (the "Demand").[67] In the Demand, the Plaintiff states four purposes for inspection, to: (i) evaluate his current ownership interest, (ii) evaluate the status of the business and financial condition of the Defendant, (iii) evaluate the performance of the Defendant's management, and (iv) investigate allegations of wrongdoing and mismanagement.[68]

Toward these purposes, the Plaintiff sought nine categories of records:

1. An accounting of the Plaintiff's current undivided interests in any Series;
2. An accounting of CSAM's current interests in any Series;
3. Records reflecting the Defendant's current business status and financial condition;

---

[64] JX142; JX185.

[65] JX132. The Plaintiff also points me to a lawsuit initiated by FOH in late-November 2024, wherein it sued its own CEO, alleging mismanagement of the business. *See* JX154.

[66] The Plaintiff was not the only one with concerns about the Defendant—in October of 2024, he got into contact with another member, who similarly expressed his fears. JX135; *see also* Tr. 5:19–23 ("Within the last year or so, a number of changes have happened within the company that have raised some concerns with [the Plaintiff], as well as fellow investors that he has social connections with as fellow members.").

[67] JX139 ("Demand").

[68] *Id.* at 11.

4.   A current list of the name and last known business, residence, or mailing address of each member of the Defendant;

5.   An accounting of the current geographic location of all underlying assets in which the Plaintiff owns any undivided interest;

6.   Proof of insurance for all underlying assets in which the Plaintiff owns any undivided interest;

7.   Any agreements relating to the storage of such underlying assets;

8.   The most recent version of any plan "outlining an orderly process of allocating assets to be sold at specific venues" as referenced in the Defendant's May 8, 2023 annual report; and

9.   Memoranda, meeting minutes, contemporaneous notes, emails, or other documents from April 1, 2023 to the date of the Demand relating to the Defendant's: (a) failure to timely file its annual report, (b) decision to halt trading on the secondary market, (c) decision to relocate any underlying assets, and (d) any buyout offers or other opportunities for asset liquidation received or considered by CSAM or the advisory board.[69]

The Plaintiff also demanded an explanation regarding "the circumstances surrounding the termination of [Mr.] Winters, including reasons for termination, how termination was authorized and effectuated, and any current plans for shareholders to properly elect a successor."[70]

The Defendant failed to respond to the Demand and, to date, has not produced any responsive documents.

---

[69] *Id.* at 12 (paraphrased). I refer to each individually as a "Request."

[70] *Id.* Later in this ruling, I also refer to the demanded explanation as a "Request."

## G. This Litigation

With no response or production, the Plaintiff initiated this action on November 1, 2024, seeking a court-ordered production and fee shifting.[71] After some back and forth, and a reassignment of this matter to me, I entered an amended scheduling order on February 5, 2025, setting this matter for an April 8, 2025 trial.[72] Through that amended scheduling order, I granted the parties' stipulation to present this matter to me for a "final decision[,]" such that the parties "waive[d] the right to seek further judicial review of [my] decision at the trial level[,]" agreeing that my decision would be "subject to direct appeal to the Delaware Supreme Court[.]"[73]

While this action was pending, the Defendant made some noteworthy business decisions. First, in a report to the SEC on August 9, 2024, the Defendant indicated that Ms. Pérez-Johnson would continue with the title of manager of CSAM and the

---

[71] D.I. 1. Although the Demand cites both the LLC Agreement and the Delaware Act, the only count in the complaint is for recovery under the Delaware Act. *Compare* Demand at 1 ("We hereby demand that [the Defendant] make available certain books and records . . . under [the Delaware Act] and [the LLC Agreement]."), *with* D.I. 1 at 12 (identifying the sole count as "Demand for Inspection of Certain Records Under 6 *Del. C.* § 18-305"). Arguably inartful pleading aside, the parties agree that the LLC Agreement plays an important part in the claims and defenses in this action. *See, e.g.*, D.I. 17 at 22 (containing the Defendant's fourth affirmative defense that the Plaintiff's demand for relief is barred because the books and records demanded, among other things, "exceed the scope of records set forth in Section 18-305 and Section 8.1(b) of [the Defendant's] Operating Agreement").

[72] D.I. 35.

[73] *Id.* at 4–5.

Defendant.[74] This report was corrected on February 27, 2025 through another filing, this time stating that as of August 9, 2024, Ms. Pérez-Johnson would "continue as [COO] of [CSAM]."[75] In another report filed with the SEC, on November 6, 2024, the Defendant noted that Ms. Pérez-Johnson would "step-down from the title Manager of [CSAM and the Defendant]" and that Mr. Neuman would "assume her responsibilities and titles."[76] This report was also corrected on February 27, 2025 with another filing, instead indicating that as of November 6, 2024, Ms. Pérez-Johnson would "step-down from the title of [COO] of [CSAM]," and that Mr. Neuman would "assume her responsibilities and title."[77]

Additionally, the Dretore Gallery website was updated, and the Luka Jersey was no longer visible.[78] Then on November 14, 2024, the Defendant formally notified its investors that its marketplace was sunsetting, with commentary that its custodian bore no information related to the state of its securities or assets.[79]

---

[74] JX131.

[75] JX192.

[76] JX149.

[77] Pretrial Order at p. 7 ¶ 33.

[78] *Compare* JX207 at 1 (clearly showing the Luka Jersey), *with* JX207 at 10 (showing a different angle of the gallery, such that the Luka Jersey is not visible).

[79] JX151. Additionally, webpages pertaining to conferences that NoCor was tied to were removed in mid-November 2024. *See* JX196; JX198.

The Defendant also engaged with the Demand. It agreed to produce documents responsive to six of the categories sought, conditioned upon Plaintiff's agreement that he will not contact other members, disclose such information to them, or contact the facilities where the Defendant stores its assets.[80] The Defendant believes that permitting the Plaintiff to contact other members "could damage the [Defendant] or its business, and such disclosure would not be in the best interest of the [Defendant]."[81] Despite some back and forth on a proposed confidentiality agreement, the parties were not able to reach common ground, and no agreement was executed.[82]

Without a resolution, trial went forward as scheduled, on April 8, 2025. This is my post-trial report.

## II. ANALYSIS

Through this action, the Plaintiff seeks inspection of books and records of the Defendant, a Delaware LLC, in his capacity as a member thereof. I begin with the statutory scheme, the baseline for a member's inspection rights in a Delaware LLC. I then address how the LLC Agreement displaces those rights. Once I have defined the Plaintiff's rights, I address the propriety of the Demand and the requests therein.

---

[80] *See* JX165 (reflecting the parties' meet-and-confer agreement).

[81] JX213 at Response 3, 9.

[82] Pretrial Order at p. 11 ¶ 49.

Ultimately, I explain the court-ordered production that should follow, and the confidentiality required under the LLC Agreement for such. Because I am ordering production, I find costs should be shifted to the Plaintiff as the prevailing party; I do, however, recommend that the parties bear their own expenses, including attorneys' fees.

### A. In limited part, Section 8.1(b) of the LLC Agreement displaces the statutory default.

In large part, the LLC Agreement contains records rights coextensive with the Delaware Act. But Section 8.1(b) contains a limited qualifier.

I begin with the Delaware Act. Section 18-305(a) of the Delaware Act affords members of a Delaware LLC the right "from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company" to obtain books and records from the company.[83] Demands for inspection "shall be in writing and shall state the purpose of such demand."[84] Once a member has established she is entitled to obtain information, "the member's right shall be to obtain such information as is necessary and essential to achieving that purpose."[85]

---

[83] I refer to Title 6, Section 18-305 of the Delaware Code more broadly as "Section 18-305."

[84] 6 *Del. C.* § 18-305(e).

[85] *Id.* § 18-305(g).

But because LLCs are creatures of contract, inspection rights under Section 18-305 may be either expanded or limited by provisions in the governing LLC agreement.[86] Thus, books and records requests in the LLC context require a close review of, and comparison between, the Delaware Act and the LLC Agreement. Here, that review and comparison revealed some daylight.

The Delaware Act and the LLC Agreement begin as near-mirror images. Compare:

| Delaware Act, Section 18-305(a) | LLC Agreement, Section 8.1(b) |
| --- | --- |
| "Each member . . . has the right . . . to obtain from the limited liability company from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company[.]" | "Each Member shall have the right, upon reasonable demand for any purpose reasonably related to the Member's Interest as a member of the Company (as reasonably determined by the Managing Member) to such information pertaining to the Company as a whole and to each Series in which such Member has an Interest, as provided in Section 18-305 of the Delaware Act[.]" |

Setting aside immaterial moves or placement of clauses, the only real difference is that the LLC Agreement gives discretion to the managing member to "reasonably determine[]" the reasonableness of a demand or its relation to the member's interest. The LLC Agreement does, however, include an additional qualifier that provides: "[f]or the avoidance of doubt, except as may be required

---

[86] *Id.*

pursuant to Article X [of this agreement], a Member shall only have access to the information (including any Series Designation) referenced with respect to any Series in which such Member has an Interest and not to any Series in which such Member does not have an Interest."[87] I address these two potential distinctions in turn. In doing so, I apply basic principles of contract interpretation because LLCs are creatures of contract, and the LLC Agreement shall be interpreted along those lines.[88]

### 1. The determination language does not alter the standard of review or burden of proof.

The determination language in the LLC Agreement, at most, provides protection to the manager in deciding how to respond to a demand for inspection. The LLC Agreement differs from the Delaware Act in providing that the reasonableness of the demand or its relation to the member's interest shall be reasonably determined by the managing member. The Defendant argues that this language grants the managing member "full and broad discretion to act," such that

---

[87] LLC Agreement at 38. Article X addresses the removal of the Defendant's managing member and is irrelevant to the matters at hand. *See* Def.'s Ans. Br. at 29–31.

As reflected below, this "avoidance of doubt" language borders on injecting more uncertainty than clarity. But unlike the language recently addressed by the Delaware Supreme Court in *LGM Hldgs., LLC v. Schurder*, 2025 WL 1162999 (Del. Apr. 22, 2025), this clause is not ambiguous and has but one reasonable interpretation.

[88] *Henson v. Sousa*, 2015 WL 460415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract.").

"all decisions that the managing member makes on behalf of the company are binding if they are made in good faith."[89] I disagree.

On its plain, objective terms, this provision, at most, gives cover to a decision made by the managing member in good faith. It does not, and cannot, displace this Court's statutorily "exclusive jurisdiction" to determine whether a member of an LLC is entitled to inspection.[90] Thus, I give no weight to the apparent determination of the Defendant's manager that the LLC Agreement limits the Plaintiff's inspection to the categories of records the Defendant has agreed to produce. Instead, I adjudge the propriety of the Plaintiff's purpose, and the scope of inspection warranted, solely based on Delaware law, as addressed below.

### 2. The series qualifier displaces the statutory default regarding series-level information.

The series qualifier does, however, displace the statutory default. The Delaware Act contemplates members accessing company-wide books and records. To some extent, the LLC Agreement continues that aim, but it makes one important distinction, which the Plaintiff concedes: as an investor in certain series, the Plaintiff is not entitled to series-specific information for those series in which he is not an

---

[89] Tr. 62:5–15.

[90] 6 *Del. C.* § 18-305(f).

investor. I reject the Defendant's argument for a more limited interpretation, which is contrary to the plain language of this qualifier.

### B. The Plaintiff has established proper purposes for inspection.

Having found the Demand is largely governed by the Delaware Act, with the slight qualifier regarding series-level records, I now turn to the propriety of the Plaintiff's stated purposes. In conducting my analysis, I borrow heavily from corporate books and records actions, noting that "Delaware courts have interpreted Section 18-305 by looking to cases interpreting similar Delaware statutes concerning corporations and partnerships."[91]

In his Demand, the Plaintiff articulated four purposes for his inspection request; to: (i) evaluate his current ownership interest, (ii) evaluate the status of the business and financial condition of the Defendant, (iii) evaluate the performance of the Defendant's management, and (iv) investigate allegations of wrongdoing and mismanagement. For trial, the Plaintiff combined these purposes into two— valuation and investigation of mismanagement and wrongdoing. The Defendant concedes that the Plaintiff's valuation purpose is proper; thus, I do not address it any further. The Defendant does, however, argue that: (1) the Plaintiff has not proven a credible basis for his investigation purpose, and (2) the Plaintiff is trying to sneak in

---

[91] In doing so, I would be remiss not to note that this action predates the recent statutory amendments to Section 220, which play no role in my analysis.

a third communication purpose. I address these in turn and find in favor of the Plaintiff on both.

### 1. The Plaintiff has proven a credible basis to support his investigation purpose.

Through the Plaintiff's investigation purpose, he seeks to "evaluate the performance of [the Defendant's] management" and "investigate allegations of wrongdoing and mismanagement[.]"[92] Under Delaware law, desiring to investigate mismanagement is a proper purpose. But to establish such a purpose, "a member 'must present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred.'"[93] "The credible basis standard imposes the lowest possible burden of proof. . . . [and] . . . does not require a member to show by a preponderance of the evidence that wrongdoing is probable."[94] "It requires only that a member establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing."[95] "That burden may be satisfied by a

---

[92] Demand at 11.

[93] *Gill v. Regency Hldgs., LLC*, 2023 WL 4607070, at *13 (Del. Ch. June 26, 2023) (ellipsis in original) (quoting *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *10 (Del. Ch. Nov. 24, 2020)). The Defendant seems to suggest that perhaps the Plaintiff's "true intent [is to] tarnish[] the reputation of the [Defendant's] owner through a smear campaign based on unfounded accusations." Def.'s Ans. Br. at 2. There is nothing that supports this conclusion.

[94] *Gill*, 2023 WL 4607070, at *13 (citation and quotation marks omitted).

[95] *Id.* (emphasis in original) (citation and quotation marks omitted).

credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[96] The Plaintiff has met his burden.

As the factual recitation reflects, the Plaintiff has identified several concerning developments in the Defendant's management and business operations. The Defendant's decision to halt secondary market trading, failure to timely file its 2023 year-end annual report, failure to communicate with members, relocation of assets to the Dretore Gallery, unexplained termination of Mr. Winters, and appointment of management with concerning litigation history, taken together, under the circumstances they arose, support a credible basis to suspect wrongdoing.

To convince me to disregard such matters, the Defendant cites to cases such as *Oklahoma Firefighters Pension & Retirement System v. Amazon.com, Inc.*[97] and *Louisiana Municipal Police Employees' Retirement System v. Lennar Corp.*,[98] which stand respectively for the propositions that "evidence of open inquiries and lawsuits alone [do not] necessarily beget[] a credible basis"[99] and that past lawsuits, even when combined with other evidence, are similarly insufficient.[100]

---

[96] *Id.* (citation and quotation marks omitted).

[97] 2022 WL 1760618 (Del. Ch. June 1, 2022).

[98] 2012 WL 4760881 (Del. Ch. Oct. 5, 2012).

[99] *Amazon*, 2022 WL 1760618, at *6.

[100] *Lennar*, 2012 WL 4760881, at *3.

But Mr. Neuman's past and present legal entanglements, considered in conjunction with the other allegations, including missed filings leading to abrupt changes in business practices, give rise to a credible basis to suspect wrongdoing.[101] As I noted before, "the existence of a credible basis to suspect possible wrongdoing sufficient to warrant further investigation does not mean that wrongdoing actually occurred."[102] It is certainly possible that once the Plaintiff is given the necessary books and records to satisfy his purposes, all concerns will be alleviated.[103] It is similarly possible that the Plaintiff's investigation will uncover something bigger. Regardless, the Plaintiff has established a credible basis to suspect wrongdoing and is entitled to inspection to investigate as much.

### 2. The Plaintiff's desire to communicate with other members is not a separate purpose for inspection.

The Defendant argues that the Plaintiff is also pursuing an unpled and un-demanded purpose to communicate with fellow members. The Defendant cries foul because such purpose was not identified in the Demand or complaint. I agree with the Defendant that an investor requesting records should be limited by their demand.

---

[101] I have also given appropriate weight to the Plaintiff's concerns with the post-suit conduct, finding that it bolsters the Plaintiff's proper purpose showing, as contemplated by *Sutherland v. Dardanelle Timber Co.*, 2005 WL 1074357, at *2 (Del. Ch. Apr. 25, 2005).

[102] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780 (Del. Ch. 2016), *abrogated on other grounds*, 214 A.3d 933 (Del. 2019).

[103] Tr. 54:7–12, 73:19–74:6, 91:4–13.

Along those lines, I will not treat the Plaintiff's communication interest as a separate purpose for inspection. True, the Plaintiff has disclosed that he seeks to "communicate with fellow members for further information regarding [his desire to seek to evaluate the Defendant's financial condition and explore wrongdoing], including whether any [other members] have had experiences similar to [his]."[104] But such interest was highlighted in connection with discussions about the confidentiality that should attach to any production. As discussed below, because confidentiality is governed by the LLC Agreement, the Plaintiff's interests are largely irrelevant.

### C. The Plaintiff is only entitled to books and records that are necessary and essential to his proper purposes.

Having found the Plaintiff established proper valuation and investigation purposes, I must now address the scope of inspection. Under Section 18-305(g), a "member's right [of inspection] shall be to obtain such information as is necessary and essential to achieving that purpose."[105] The Plaintiff bears "the burden of proving that each category of books and records is essential to accomplishment of the [member's] articulated purpose for the inspection."[106]

---

[104] Pl.'s Op. Br. at 53.

[105] As addressed above, the LLC Agreement tracks this language in all material respects.

[106] *Emps.' Ret. Sys. of R.I. v. Facebook, Inc.*, 2021 WL 529439, at *4 (Del. Ch. Feb. 10, 2021) (citation and quotation marks omitted).

The Plaintiff made nine requests for records, which I refer to as Requests 1 through 9, and one demand for an explanation, which I will treat as Request 10. After the Plaintiff filed this action, the Defendant agreed to provide documents responsive to Requests 1, 2, 4 (in part), 5, 6, and 7, and represented that no documents exist in response to Request 8.[107] The Defendant shall produce as promised (in addition to the court-ordered production), subject to the confidentiality restrictions addressed below.

Herein, I focus on the disputed requests: Requests 3, 4 (in remaining part), 9, and 10. I find that the Plaintiff is entitled to obtain documents responsive to the former three, but is not entitled to an explanation as demanded in Request 10.

- **Request 3.** In Request 3, the Plaintiff seeks records reflecting the Defendant's current business status and financial condition. This is company-level information, which the Defendant contends is outside the Plaintiff's interest in any specific series. I disagree. Information about the overall business status and financial condition of the Defendant, as a whole, is tied directly to the Plaintiff's investment. Request 3 does not require a look behind the curtain of any series in which the Plaintiff does not have an interest, which would be barred by the LLC Agreement. The Plaintiff is otherwise entitled to inspect books and records responsive to Request 3.
- **Request 4.** Through Request 4, the Plaintiff seeks a current list of the name and last known business, residence, or mailing address of each member of the Defendant. The Defendant initially agreed to produce

---

[107] *See Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *9 (Del. Ch. Oct. 19, 2001) ("Naturally, if the records . . . do not exist, the Defendant has no duty to do the impossible.").

this information.[108] Then, a few months later at trial, the Defendant walked back this agreement and explained it would only produce information for members for each series in which the Plaintiff has invested. This reversal is unwarranted given the LLC Agreement's treatment of all series members as members of the Defendant, and the Defendant should be held to its initial agreement (but without the qualifier to not contact other members, as I will explain).

- **Request 9.** Request 9 is the Plaintiff's broadest request, seeking not only board- or officer-level records, but also notes, emails, and other documents regarding the Defendant's: (a) failure to timely file its annual report, (b) decision to halt trading on the secondary market, (c) decision to relocate any underlying assets, and (d) consideration of any buyout offers or other opportunities for asset liquidation received or considered by CSAM or the advisory board. Setting aside the breadth of materials requested, the subject matter in (a)–(c) is on point and goes directly to the Plaintiff's credible basis to suspect wrongdoing. The buyout/opportunity angle in (d) is not, however, supported by the record before me; the record does not support a credible basis to suspect usurpation of corporation opportunities sufficient to open that door. Thus, the Defendant should produce formal materials[109] responsive to (a)–(c). Following the footsteps of cases like *Alexandria Venture Investments, LLC v. Verseau Therapeutics, Inc.*, I defer judgment on the inspection beyond any such formal materials until the record further develops (if at all) as to the necessity of those less formal documents.[110]

- **Request 10.** Through Request 10, the Plaintiff demands an explanation regarding the circumstances surrounding the termination of Mr. Winters. Such is not a request for inspection of identified books and records and, even if I rewrote it to become one, the Defendant offered

---

[108] *See* JX177 at 11 ("Subject to [the] Plaintiff agreeing not to contact the other members of the Company, [the] Defendant will provide a current list of the name and last known business, residence, or mailing address of each Member.").

[109] As defined by Vice Chancellor Laster in *Lebanon County Employees' Retirement Fund v. Amerisourcebergen Corp.*, "formal board materials" are those "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered[.]" 2020 WL 132752, at *24 (Del. Ch. Jan. 13, 2020). I adopt the same line of precedent, but as applied to the alternative entity context.

[110] *See* 2020 WL 7422068, at *13 (Del. Ch. Dec. 18, 2020).

explanation for the circumstances surrounding Mr. Winters's termination through this litigation. Nothing further is warranted.

Putting this together, the Plaintiff is entitled to inspect, and the Defendant is compelled to produce: records reflecting the Defendant's current business status and financial condition; a current list of the name and last known business, residence, or mailing address of each member of the Defendant; and formal materials regarding the Defendant's failure to timely file its annual report, decision to halt trading on the secondary market, and decision to relocate any underlying assets.

### D. The court-ordered production and inspection should be subject to a confidentiality agreement.

Although the Plaintiff is entitled to inspect most of the requested records, the LLC Agreement has certain confidentiality requirements. Generally, the LLC Agreement provides that information disclosed to members like the Plaintiff in connection with the LLC Agreement must be held by that member "as confidential information . . . in confidence."[111] It contemplates that "[a]ll information" prepared in accordance with Article VIII (providing, in relevant part, for the inspection of books and records) and other information disclosed under or in connection with the LLC Agreement is "confidential and non-public[.]"[112] Such information may not be

---

[111] LLC Agreement § 14.1.

[112] *Id.*

disclosed to any person (defined broadly)[113] or used to the detriment of the Defendant; it shall, instead, be used "exclusively for the purposes of monitoring and evaluating its investment in the [Defendant]."[114]

For books and records demands, specifically, Section 8.1(b), provides: "the Managing Member shall be permitted to require such Member to enter into a confidentiality agreement in form and substance reasonably acceptable to the Managing Member." Such "reasonable" qualifier, at least when applied to restricting member access or communications, invokes the Delaware Act which permits a manager:

> [T]to keep confidential from the members, for such period of time as the manager deems reasonable, any information which the manager reasonably believes to be in the nature of trade secrets or other information the disclosure of which the manager in good faith believes is not in the best interest of the limited liability company or could damage the limited liability company or its business or which the limited liability company is required by law or by agreement with a third party to keep confidential.

Taken as a whole, the Defendant's production to the Plaintiff should be conditioned on a confidentiality agreement. That agreement, which the parties are directed to negotiate in good faith, should require the Plaintiff to keep all produced

---

[113] "Person" is defined as "any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, Governmental Entity or other entity." *Id.* at 12.

[114] *Id.* § 14.1.

records confidential and to not disclose those records to any person. The Defendant's request for a bar on member-to-member communication is, however, unsupported. The Plaintiff's communications with other members of the Defendant is permissible, provided that within those communications the Plaintiff does not disclose confidential information to which the other member is not already privy. The Defendant's argument that the Plaintiff should not be permitted to contact members without the Defendant's express written permission is inconsistent with Delaware law, which contemplates that "where a [books and records] claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation *or through direct contact with the [company's] directors and/or stockholders*."[115] I agree, however, that the Plaintiff is not permitted to use the production information to contact storage facilities, which would go against the restriction that the information produced be used "exclusively for the purposes of monitoring and evaluating its investment in the [Defendant]." And I agree that each of the Plaintiff's advisors, accountants, or experts should sign undertakings as contemplated under the LLC Agreement.

---

[115] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002) (emphasis added). I also agree with the Defendant's argument that it "faces significant harm if [the Plaintiff] is not restricted from contacting . . . the storage facilities, as there is a risk of spreading misinformation that could damage the Company's reputation and operations." Def.'s Ans. Br. at 36 n.13.

In striking the balance between the Defendant's legitimate confidentiality concerns against the Plaintiff's right to meaningful access, I direct the parties to meet and confer about a confidentiality agreement consistent with this ruling.

### E. Each side should bear its own fees under the American Rule, but costs should be shifted in the Plaintiff's favor.

The Plaintiff asks that his fees and costs be shifted to the Defendant under the bad faith exception to the American Rule. I find no evidence of bad faith and thus decline to shift fees. I do, however, deem the Plaintiff the overall "prevailing party," and thus shift costs in his favor.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[116] Conversely, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The Plaintiff has failed to prove an exception to the American Rule, though he is the "prevailing party."

The Plaintiff avers that he is entitled to fees and costs because of the Defendant's bad faith conduct by way of ignoring the Demand, failing to initially meet and confer, answering the complaint in an untimely fashion, and neglecting to

---

[116] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

meaningfully engage in confidentiality agreement negotiations.[117] Although I acknowledge that the Defendant initially failed to respond to the Demand and was not appropriately involved with the litigation when first initiated, I do not find that its conduct rises to the level of bad faith necessary to shift fees.

The Plaintiff points me to *Pettry v. Gilead Sciences Inc.*[118] as a purportedly comparable case to the one before me; I disagree. In *Pettry*, now-Chancellor McCormick explained that the defendant "exemplified the trend of overly aggressive litigation strategies by blocking legitimate discovery, misrepresenting the record, and taking positions for no apparent purpose other than obstructing the exercise of [the plaintiff's] statutory rights[,]" which supported fee shifting.[119]

Such is not the case here. After the Defendant's current counsel entered its appearance, it answered the complaint and engaged with both the Plaintiff and this litigation more broadly. That engagement included the Defendant's agreement to make a voluntary production upon the execution of a reasonable confidentiality agreement. Sure, the parties disagreed about that confidentiality agreement and,

---

[117] Pl.'s Op. Br. at 64–69. I disagree that the Defendant's proposed confidentiality agreement unreasonably contained "draconian conditions[.]" *Id.* at 69.

[118] 2020 WL 6870461 (Del. Ch. Nov. 24, 2020).

[119] *Id.* at *30.

ultimately, could not resolve those disputes, but the parties' efforts, in my eyes, are indicative of good (rather than bad) faith.[120]

Under Rule 54(d), costs will be shifted in favor of the prevailing party. This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[121] As such, the Plaintiff meets the bill; he successfully prosecuted his case in large part and is entitled to most of the books and records sought. As the prevailing party, costs should be shifted in his favor.

## III. CONCLUSION

For these reasons, the Defendant is directed to collect and produce, as further explained above, documents responsive to Requests 1 through 7, and 9. The parties are directed to meet and confer regarding the timing and mechanics of such production, including an appropriate confidentiality agreement, and within seven

---

[120] The Defendant asked through pretrial briefing and at trial that fees be shifted in its favor. Def.'s Ans. Br. at 57–59. No such request was made either in its answer or through the pretrial order. This delayed articulation could be viewed as waiver, a very issue raised by the Plaintiff. *Cf. Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *44 (Del. Ch. Apr. 30, 2021) ("Generally speaking, when an argument is first raised in a pretrial brief after the parties already have shaped their trial plans, it is simply too late and deemed waived.") (cleaned up) (quoting *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012)). On its merits, though, the request also fails; there is no evidence of bad faith, glaringly egregious conduct by the Plaintiff (either pre-litigation or otherwise). Thus, the request is denied.

[121] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

business days submit a proposed order implementing these rulings and identifying if any issues remain for my consideration (including any disputes that arise in the meet and confer process regarding a confidentiality agreement).

This a magistrate's report. As noted, the parties have stipulated that this action be submitted for a final decision under Court of Chancery Rule 144(g), meaning they have waived the right to seek further judicial review of this decision at the trial level. Any challenge to these rulings, once final, shall be subject to the same procedural and substantive standards as are applicable to appeals from decisions of the Chancellor or a Vice Chancellor.